**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KIMBERLY A. PISINSKI, an individual, 54 Hazard Avenue, Suite 118, Enfield, Connecticut 06082 | Case No.: 13-CV-1112 |
| and | **COMPLAINT** |
| MORGAN DREXEN, INC., a Nevada Corporation, 675 Anton Boulevard, Costa Mesa, California 92626, | |
| Plaintiffs, | |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU, 1700 G Street NW, Washington, District of Columbia 20552 | |
| Defendant. | |

Plaintiffs Kimberly A. Pisinski ("Pisinski") and Morgan Drexen, Inc. ("Morgan Drexen") (together, "Plaintiffs"), by and through their undersigned counsel, file this Complaint against Defendant Consumer Financial Protection Bureau (the "CFPB"), a federal agency recently created pursuant to the Dodd-Frank Act, Title X, 12 U.S.C. §§ 5481 *et seq.* ("Dodd-Frank Act"), making the following allegations based on personal knowledge and upon information and belief.

## NATURE OF THE ACTION

1.     Plaintiffs bring this action because CFPB's structure insulates it from political accountability and internal checks and balances in violation of the United States Constitution. Unbridled from constitutionally-required accountability, CFPB has engaged in *ultra vires* and abusive practices, including attempts to regulate the practice of law (a function reserved for state bars), attempts to collect attorney-client protected material, and overreaching demands for, and

mining of, personal financial information of American citizens, which has prompted a Government Accountability Office ("GAO") investigation, commenced on July 12, 2013.

2.      Serious constitutional questions have been raised about CFPB's structure and insulation from mandatory checks and balances, but to date, no court has passed on these questions.  CFPB obtained its first Senate-confirmed Director only days ago on July 16, 2013.  CFPB has threatened Plaintiffs with legal action and has used improper and coercive tactics against Plaintiffs.

3.      Plaintiffs seek an order halting these tactics and declaring CFPB's structure to be unconstitutional, and declaring unconstitutional the provisions of the Dodd-Frank Act creating and empowering the CFPB.

## PARTIES

4.      Pisinski is an attorney licensed to practice law in Connecticut, with a physical office at 54 Hazard Avenue, Suite 118, Enfield, Connecticut 06082.  Pisinski contracts with Morgan Drexen for support services and for use of the company's proprietary software for select practice areas that she offers to her clients.

5.      Morgan Drexen is a Nevada Corporation with its principal place of business at 675 Anton Boulevard, Costa Mesa, California 92626.

6.      CFPB is a recently-created agency of the United States that is charged with regulating consumer protection as it relates to financial products and services.  CFPB's business address is 1700 G Street NW, Washington, District of Columbia 20552.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action and the parties under 28 U.S.C. § 1331 (federal question).

8.      Venue lies in this district under 28 U.S.C. § 1391(e) because a substantial part of the activities alleged herein occurred in this judicial district.

## FACTUAL ALLEGATIONS

**I.      KIMBERLY A. PISINSKI'S LEGAL PRACTICE**

9.      Pisinski is an attorney licensed to practice law in Connecticut.

10.      From 1998 to 2000, Pisinski served as a Deputy Assistant Public Defender in Litchfield County, Connecticut.

11.      Since 2000, Pisinski has focused her practice on providing legal representation to adults and children in criminal court, juvenile court, civil court, administrative hearings, and education settings.

12.      When not providing the underprivileged with legal advice and counseling, Pisinski spends her time volunteering for non-profit organizations such as MotherWoman, Inc., and Zonta International – organizations dedicated to promoting and improving the welfare of women and children worldwide.

13.      Pisinski is a solo practitioner.

14.      In order to continue providing legal services to the underprivileged, Pisinski keeps her operation costs down by employing a very limited office staff.

15.      Pisinski offers her clients bankruptcy services.

16.      As a part of any bankruptcy engagement with Pisinski, clients may elect for her to first attempt to amicably resolve their debts with creditors prior to filing a bankruptcy petition.

17.      Pisinski's efforts at resolving her clients' debts are ancillary to, and a part of, the bankruptcy services that she provides for her clients.

18.     Pisinski does not charge an additional upfront fee if her clients request that she first attempt to amicably resolve their debts with their creditors.

19.     Pisinski does not collect any fees for the time and expense she incurs in attempting to settle with her clients' creditors until she successfully obtains a settlement agreement for the account on behalf of her clients and at least one payment is made per the terms of the agreement.

20.     Law firms which provide bankruptcy services to consumers are often high volume practices.

21.     Pisinski may represent dozens of individual bankruptcy clients at a time.

22.     In representing her clients in bankruptcy or other legal matters Pisinski can delegate tasks to non-attorney support staff when such staff is supervised by Pisinski, pursuant to Rule 5.3 of the Connecticut Rules of Professional Conduct, and Pisinski remains responsible for her non-attorney staff.

23.     In order to represent her clients in the most efficient and cost-effective way possible, and rather than hiring additional full-time paralegals and administrative staff, Pisinski has chosen to engage independent contractor non-lawyer assistants to provide support services for her law practice.

24.     Pisinski has exercised her right as an attorney to engage Morgan Drexen as a non-lawyer assistant to provide her with these legal support services.

25.     Morgan Drexen personnel serve as Pisinski's paralegals and support staff.

26.     By contracting with Morgan Drexen for these legal support services, Pisinski is able to realize efficiencies and significant cost savings for her law practice and serve a greater number of consumers with dire legal needs, but limited financial means.

27.     Pisinski maintains supervisory authority over the non-lawyer support staff at Morgan Drexen and remains responsible for the services delegated to Morgan Drexen.

## II.     MORGAN DREXEN'S SUPPORT SERVICES FOR LAWYERS

28.     Morgan Drexen licenses its proprietary software and provides live paraprofessional and support services to lawyers and law firms.

29.     By contracting with Morgan Drexen, law firms can reduce their overhead fees, improve efficiencies, and realize greater profitability.

30.     Morgan Drexen has provided support services to attorneys in the areas of debt resolution, bankruptcy, personal injury, mass tort litigation, and tax preparation.

31.     The attorneys who use Morgan Drexen's services direct and supervise Morgan Drexen to ensure that the quality of all services provided to their clients is compatible with their professional obligations as attorneys.

32.     The attorneys control the services performed by Morgan Drexen and maintain ultimate responsibility for services Morgan Drexen performs for the attorneys' clients.

33.     Pisinski has retained Morgan Drexen to provide legal support services of the nature described above, including: assisting in intake based upon screening parameters proscribed by Pisinski; assisting in document collection and processing; handling scheduling matters; offering the first line of communication to Pisinski for her clients and the clients' creditors; completing necessary paperwork; assisting in accounting; and otherwise providing administrative support.

34.     All of the services provided by Morgan Drexen are designed to ensure that the attorneys contracting with Morgan Drexen, including Pisinski, and their clients are kept informed of all events and developments during the course of the legal representation.

35.     Morgan Drexen is retained and compensated by the attorneys that engage its services.

36.     Morgan Drexen is not compensated by any client of the attorneys.

37.     Morgan Drexen does not directly contract with consumers.

38.     Morgan Drexen only contracts to provide its services to attorneys.

### III.     CFPB'S INVESTIGATION OF MORGAN DREXEN AND DEMAND FOR CONFIDENTIAL AND PRIVILEGED FINANCIAL DATA

39.     On March 13, 2012, CFPB issued a Civil Investigative Demand ("CID") to Morgan Drexen seeking various categories of information.

40.     The information sought by CFPB is relevant to Morgan Drexen's business and its relationship with attorneys that provide debt settlement services that are ancillary to their legal representation.

41.     Morgan Drexen cooperated with CFPB's investigation, providing numerous responses to interrogatories and producing documents.  The following occurred as part of CFPB's investigation:

     a.     CFPB sent CIDs or similar documents seeking information to at least one attorney supported by Morgan Drexen;

     b.     CFPB sent CIDs or similar documents seeking information to financial institutions and other companies associated with Morgan Drexen;

     c.     CFPB demanded that Morgan Drexen produce confidential financial information belonging to the clients of the attorneys supported by Morgan Drexen; and

     d.     CFPB deposed various officers of Morgan Drexen, including its Chief Executive Officer, Walter Ledda.

42.     Most recently, on April 22, 2013, CFPB staff contacted counsel for Morgan Drexen by telephone.

43.     CFPB staff advised that CFPB was proceeding in accordance with its Notice and Opportunity to Respond and Advise (NORA) process, and that CFPB was considering enforcement action against Morgan Drexen.

44.     CFPB has also taken the position that the attorneys supported by Morgan Drexen are in violation of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. §§ 310.1 *et seq.*, because CFPB considers the attorneys' hour rates for bankruptcy services as "upfront" fees, apparently because the attorneys also perform ancillary debt-settlement services.

45.     CFPB staff sent a letter on April 22, 2013, inviting Morgan Drexen to submit its own written statement as to why CFPB should not take action against Morgan Drexen.

46.     On May 8, 2013, counsel for Morgan Drexen responded with a written submission refuting CFPB's allegations.

47.     Specifically, Morgan Drexen explained that CFPB did not have jurisdiction over the law practice of the attorneys supported by Morgan Drexen; that the fees charged by the attorneys supported by Morgan Drexen for bankruptcy services are not collected in connection with debt settlement and are thus not "upfront fees" prohibited by the TSR; and that CFPB could not prohibit Morgan Drexen from supporting attorneys who provide services in parallel with debt settlement because this would be tantamount to an outright ban on commercial speech in violation of the First Amendment.

## IV.   GAO'S INVESTIGATION OF CFPB FOR DATA-MINING PERSONAL INFORMATION OF AMERICAN CITIZENS

48.     On April 23, 2013, the Senate Committee on Banking, Housing, and Urban Affairs held a hearing on the Semi-Annual Agenda of CFPB.

49.     At the April 23, 2013 hearing, United States Senator Mike Crapo (R-Idaho) raised concerns regarding CFPB's data collection efforts.

50.     On May 16, 2013, Senator Crapo sent a letter to CFPB Director Richard Cordray requesting that CFPB furnish information concerning its "legal authority to collect consumer lending and credit data for the agency's Big Data initiative."

51.     On May 23, 2013, Director Cordray sent a letter to Senator Crapo responding to Senator Crapo's May 16, 2013 letter and disputing that CFPB had a "Big Data initiative."

52.     On July 2, 2013, Senator Crapo wrote to the Comptroller General of GAO, requesting an investigation into CFPB's data collection practices.

53.     On July 12, 2013, GAO accepted Senator Crapo's request as within the scope of its authority and stated that it would begin the work (*i.e.*, investigate CFPB's data collection practices) "shortly."

54.     Other government officials and groups, including public watchdog groups, have expressed concern about CFPB's actions in collecting personal consumer financial data.

55.     For example, Judicial Watch President Tom Fitton stated that CFPB's actions were "a more direct assault on American citizens' reasonable expectation of privacy than the gathering of general phone records."

56.     Mr. Fitton has also stated that CFPB is "an out-of-control government agency that threatens the fundamental privacy and financial security of Americans.  This is every bit as serious as the controversy over the NSA's activities."

57.     David T. Hirschmann, the President and Chief Executive Officer of the U.S. Chamber of Commerce's Center for Capital Markets, wrote in a letter to Director Cordray that

CFPB "should not misuse the supervision process to demand huge amounts of data" and expressed concern that CFBP's requests are otherwise improper.

58.     John Berlau, a scholar of the Competitive Enterprise Institute, has called CFPB's data collection activities "an NSA-style surveillance program without any serious justification, such as terrorism."

59.     Randy E. Barnett, a professor of constitutional law at Georgetown University, wrote in the Wall Street Journal that NSA and CFPB's activities "dangerously violate[] the most fundamental principles of our republican form of government" (the Fourth Amendment's prohibition against unreasonable searches and seizures, and the requirement that no warrants shall issue but upon probable cause).  Mr. Barnett further rote that:  "[t]he secrecy of these programs makes it impossible to hold elected officials and appointed bureaucrats accountable."

## V.     CFPB LACKS CONSTITUTIONALLY-REQUIRED ACCOUNTABILITY

### A.     Unlawful Delegation of Broad, Undefined Power

60.     Congress created CFPB through Title X of the Dodd-Frank Act.

61.     Section 1011(a) of the Dodd-Frank Act established CFPB to "regulate the offering and provision of consumer financial products or services under the Federal consumer financial laws."  12 U.S.C. § 5491(a).

62.     The Dodd-Frank Act grants authority to CFPB over consumer financial product and service firms.

63.     Section 1031(a) of the Dodd-Frank Act authorizes CFPB to take any of several enumerated actions, including direct enforcement action, to prevent a covered person from engaging in "unfair," "deceptive," or "abusive" practices.  12 U.S.C. § 5531(a).

64.     Section 1031(b) of the Dodd-Frank Act authorizes CFPB to prescribe rules identifying such practices under Federal law.  12 U.S.C. § 5531(b)

65.     The Dodd-Frank Act provides no definition for "unfair" or "deceptive" acts or practices, leaving those terms to CFPB to interpret and enforce, either through ad hoc litigation or regulation.

66.     CFPB is not bound by prior agencies' interpretations of similar statutory terms.

67.     The Dodd-Frank Act does not provide meaningful limits on what CFPB can deem an "abusive" act or practice.

68.     Section 1031(d) leaves the term "abusive" to be defined by CFPB, subject only to the limitations that the act or practice "(1) materially interferes with the ability of a consumer to understand a term or condition of a consumer financial product or service; (2) takes unreasonable advantage of (A) a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service; (B) the inability of the consumer to protect the interests of the consumer in selecting or using a consumer financial product or service; or (C) the reasonable reliance by the consumer on a covered person to act in the interests of the consumer." 12 U.S.C. § 5531(d).

69.     These limits offer no transparency or certainty for covered persons.

70.     These limits are subjective factors that can be interpreted broadly by CFPB.

71.     The Dodd-Frank Act's open-ended grant of power over what CFPB deems to be "unfair," "deceptive," or "abusive" practices is exacerbated by CFPB's discretion under Section 1022(b)(3) to unilaterally exempt any class of covered person, service providers, or consumer financial products or services from the scope of any rule promulgated under Title X.  12 U.S.C. 5512(b)(3).

72.     The Dodd-Frank Act grants CFPB wide-ranging investigation and enforcement powers.

73.     Section 1052 authorizes CFPB to engage in investigations, issue subpoenas, civil investigative demands, and commence judicial proceedings.  12 U.S.C. § 5562.

74.     Section 1053 authorizes CFPB to conduct hearings and adjudicative proceedings to ensure or enforce compliance with the Dodd-Frank Act, any rules promulgated thereunder, or any other Federal law that CFPB is authorized to enforce.  12 U.S.C. § 5563.

75.     Section 1054 authorizes CFPB to commence a civil action against any person whom it deems to have violated a Federal consumer financial law, and to seek all legal and equitable relief.  12 U.S.C. § 5564.

76.     On May 7, 2013, CFPB announced that it has undertaken a "comprehensive effort to prevent consumer harm in the debt-relief industry."

### B.     Elimination of Checks and Balances

77.     Title X of the Dodd-Frank Act eliminates the Constitution's fundamental checks and balances that would ordinarily limit or channel CFPB's use of power.

78.     Congress has no power of the purse over CFPB, because the Dodd-Frank Act authorizes CFPB to fund itself by unilaterally claiming funds from the Federal Reserve Board ("FRB").

79.     The Director of CFPB cannot be removed at the pleasure of the President.

80.     The Director of CFPB determines the amount of funding CFPB receives from FRB under Section 1017(a)(1) of the Dodd-Frank Act.  12 U.S.C. § 5497(a)(1).

81.     FRB must then transfer those funds to CFPB.

82.     Section 1017(a)(2)(B) authorizes CFPB to claim an increasing percentage of the Federal Reserve System's 2009 operating expenses, beginning in fiscal year 2011 at up to 10

percent of those expenses, and reaching up to 12 percent in fiscal year 2013 and thereafter, adjusted for inflation.  12 U.S.C. § 5497(a)(2)(B).

83.     This structure will permit CFPB's Director to unilaterally requisition up to $597,600,000 in 2013, and thereafter, adjusted for inflation.

84.     CFPB's automatic budget authority is nearly double the FTC's entire budget request to Congress for fiscal year 2013.

85.     Section 1017(a)(2)(C) also prohibits the House and Senate Appropriations Committees from attempting to "review" CFPB's self-funded budget.  12 U.S.C. § 5497(a)(2)(C).

86.     The Dodd-Frank Act also insulates CFPB from the President's oversight.

87.     Under Section 1011(c), after appointment (with the advice and consent of the Senate), CFPB's Director receives a five-year term in office and may be removed by the President only for "inefficiency, neglect of duty, or malfeasance in office."  12 U.S.C. § 5491(c).

88.     Thus, all of CFPB's power is vested in its Director, without the moderating influence of other commissioners, officials, or governors.

89.     Judicial oversight is also reduced, because Section 1022(b)(4)(B) requires that courts grant the same deference to CFPB's interpretation of federal consumer financial laws that they would "if the Bureau were the only agency authorized to apply, enforce, interpret, or administer the provisions of such Federal consumer financial law."  12 U.S.C. § 5512(b)(4)(B).

90.     The foregoing violates the Constitution's separation of powers.

**VI.     CFPB'S ATTEMPT TO USURP STATE FUNCTIONS BY ATTEMPTING TO REGULATE LAWYERS IN THE PRACTICE OF LAW**

91.     Section 1011(a) of the Dodd-Frank Act established CFPB to "regulate the offering and provision of consumer financial products or services under the Federal Consumer Financial Laws."  12 U.S.C. 5491(a).

92.     Among the authority transferred to CFPB by the Federal Trade Commission ("FTC") is the authority to regulate "debt relief services" under the TSR.

93.     While the Dodd-Frank Act bestows upon CFPB relatively broad authority to regulate many aspects of "financial products or services," Section 1027(e) explicitly carves out an exception for attorneys engaged in the practice of law. 12 U.S.C. § 5517(e).

94.     Specifically Section 1027(e) states, under "exclusion for the practice of law":

> Except as provided under paragraph (2), the Bureau may not exercise any supervisory or enforcement authority with respect to an activity engaged in by an attorney as part of the practice of law under the laws of a State in which the attorney is licensed to practice law. . . . Paragraph (1) shall not be construed so as to limit the exercise by the Bureau of any supervisory, enforcement, or other authority regarding the offering or provision of a consumer financial product or service described in any subparagraph of section 5481(5) of this title (A) that is not offered or provided as part of, or incidental to, the practice of law, occurring exclusively within the scope of the attorney-client relationship; or (B) that is otherwise offered or provided by the attorney in question with respect to any consumer who is not receiving legal advice or services from the attorney in connection with such financial product or service.

95.     Thus, CFPB cannot exercise authority over attorneys that fall within this exclusion pursuant to the Dodd-Frank Act.

96.     Sections 1061 to 1067 of the Dodd-Frank Act also granted to CFPB the authority to enforce certain business practices transferred to it by other administrative agencies. 12 U.S.C. §§ 5581-5587.

97.     On August 10, 2010, the FTC, in exercising its rulemaking authority amended the TSR to extend its reach to "debt relief services."  The amendments of the TSR have been codified as 16 C.F.R. § 310 *et seq*.

98.     The FTC explained that the purpose of the amendments was to "protect consumers from deceptive or abusive practices in the telemarketing of debt relief service." 75 Fed. Reg. 48458, 48458 (Aug. 10, 2010).

99.     The FTC amended the TSR to accomplish the following:

> define debt relief services, prohibit debt relief providers from collecting fees until after services have been provided, require specific disclosures of material information about offered debt relief services, prohibit specific misrepresentations about material aspects of debt relief services, and extend the TSR's coverage to include inbound calls made to debt relief companies in response to general media advertisements.

*Id.*

100.    Under the amended TSR, the term "debt relief services" was defined to include "any program or service represented, directly or by implication to negotiate, settle, or in any way alter the terms of payment or other terms of the debt between a person and one or more unsecured creditors or debt collectors, including, but not limited to, a reduction in the balance, interest rate, or fees owed by a person to an unsecure creditor or debt collector."  16 C.F.R. § 310.2.

101.    The TSR does not include an exemption for attorneys practicing law.

102.    The FTC explained that "an exemption from the amended rule for attorneys engaged in the telemarketing of debt relief services is not warranted." 75 Fed. Reg. 48458, 48468.  The FTC based its findings on the following:

> a.     First, the FTC's assumption that attorneys "who provide bona fide legal services," do not engage in "interstate telephonic communications in order to solicit potential clients to purchase debt relief services." *Id.*

b.      Second, attorneys generally meet their prospective clients in person before agreeing to represent them.  *Id.*

c.      Third, the FTC believed that "attorneys acting in compliance with state bar rules and providing bona fide legal services already fall outside of the TSR's coverage in most instances."  *Id.*

d.      Fourth, attorneys, and "those partnering with attorneys, who principally rely on telemarketing to obtain debt relief service clients . . . engaged in the same types of deceptive and abusive practices as those committed by non-attorneys."  *Id.*

**e.**      Fifth, the existing scope of the TSR and several other statutes and FTC rules designed to curb deception, abuse, and fraud" also does not exempt attorneys from their regulations. 75 Fed. Reg. 48458, 48469.

103.    The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X.

104.    Aside from the attorney exemption found in the Dodd-Frank Act, the U.S. Supreme Court and the U.S. District Court for the District of Columbia have both found that the licensing and regulation of lawyers is left exclusively to the states, including the setting forth of professional standards and discipline for attorneys. *See, e.g., ABA v. FTC,* 430 F.3d 457 (D.C. Cir. 2005); *Leis v. Flynt,* 439 U.S. 438, 442 (1979).

105.    The States have the power to regulate the practice of law absent a clear Congressional statement in the language of a statute indicating otherwise.  *ABA v. FTC*, 430 F.3d 457, 471-72 (D.C. Cir. 2005).

**VII.    CFPB'S ACTIONS THREATEN PLAINTIFFS WITH IRREPARABLE HARM**

106.    CFPB has demanded that Morgan Drexen produce documents that contain the personal financial information that belongs to clients of attorneys (like Pisinski) that are supported by Morgan Drexen, and that have been retained with regard to possible bankruptcy.

107.    Morgan Drexen does not have authorization from the attorneys to disclose this information, which is protected by the attorney-client privilege, as well as any applicable state laws that require the safekeeping of client information, including personal financial information.

108.    Providing this information to CFPB would cause Morgan Drexen harm because:

      a.    Attorneys who contract with Morgan Drexen will potentially terminate their contracts in favor of other companies that are not being required to produce their clients' personal financial information to CFPB;

      b.    Clients of the attorneys that contract with Morgan Drexen would potentially terminate their attorneys (who would then stop paying Morgan Drexen for its services); and

      c.    Morgan Drexen would potentially be at risk for lawsuits related to the violation of any applicable laws requiring the protection of client confidences and personal financial data, particularly if Morgan Drexen produces such data to an unconstitutional entity and one that is under investigation by the GAO.

109.    CFPB agents have stated to Morgan Drexen that the only way it can comply with CFPB's directives is to stop providing non-attorney/paralegal services to attorneys who offer their clients debt settlement services as a component of the attorneys' bankruptcy services or as a separate engagement along with the attorneys' bankruptcy services.

110.     Stopping the provision of these services would cause irreparable harm to Plaintiffs for several additional reasons:

    a.    The attorneys supported by Morgan Drexen believe that providing debt settlement services while a bankruptcy petition is being deliberated and prepared is a component of the attorney's strategy; and

    b.    If Morgan Drexen cannot support such attorneys with regard to such engagements (*i.e.*, bankruptcy and debt settlement), they will likely seek support elsewhere, or, alternatively, be forced to re-evaluate the cost of their services because they will not benefit from the economies of scale and efficiencies that Morgan Drexen provides.

111.     The foregoing engagements comprise a large percentage of Morgan Drexen's total business, and any requirement that Morgan Drexen stop providing these services to attorneys would threaten the viability of Morgan Drexen's business.

112.     In addition to the foregoing, CFPB's investigation has caused Morgan Drexen significant harm, including:

    a.    Morgran Drexen has diverted substantial attention and resources, in terms of paying attorney's fees, as well as the company time necessary to provide officers for depositions, collect and review documents, and otherwise respond to CFPB's demands;

    b.    CFPB's investigation has significantly increased Morgran Drexen's costs with respect to accessing credit.  For example, CFPB sent a CID to Morgan Drexen's banking partners, which led to the company's losing its credit facilities.  CFPB also sent a CID to U.S. Capital, which has

impacted Morgan Drexen's ability to obtain reasonable financing.  Morgan Drexen now pays 22% interest where, before the CID, Morgan Drexen was able to obtain financing at 4.5%;

c. Responding to CFPB's investigation has placed a severe strain on Morgan Drexen's business operations;

d. CFPB has demanded documents from certain of attorneys supported by Morgan Drexen;

e. CFPB has demanded documents of Kovel/Fuller, which partners with Morgan Drexen to provide marketing services to the attorneys supported by Morgan Drexen;

f. CFPB's investigation, coupled with Morgan Drexen's disclosure of the investigation to its attorney business customers, has been stigmatizing to Morgan Drexen; and

g. CFPB has threatened to send CIDs to all of Morgan Drexen's attorney customers in order to obtain their clients' bankruptcy information.

113. Section 1011(b)(2) of the Dodd Frank Act requires that CFPB have a Senate-confirmed Director.  *See* 12 U.S.C. § 5491(b)(2) ("[T]he Director shall be appointed by the President, by and with the advice and consent of the Senate.").

114. Until recently, no Senate-confirmed director was in place.

115. On July 16, 2013, the Senate confirmed CFPB's first Director.

## CAUSES OF ACTION

### COUNT I
### (Violation of United States Constitution)

116.   Plaintiffs re-allege and incorporate by reference the allegations contained in all of the preceding paragraphs.

117.   The Constitution provides that all "legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."  U.S. Const. art. I, § 1.

118.   The Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law. . ."  U.S. Const. art. I, § 9.

119.   The Constitution provides that the "executive Power shall be vested in a President," U.S. Const. art. II, § 1, and that "he shall take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

120.   By delegating effectively unlimited powers to CFPB, by eliminating Congress's power of the purse over CFPB, by eliminating the President's power to remove CFPB's Director at will, and by limiting judicial review of CFPB's actions and legal interpretations, Title X of the Dodd-Frank Act violates the Constitution's separation of powers.

121.   Title X's delegation of unlimited power to CFPB, together with the elimination of the necessary checks and balances on CFPB's exercise of that power, is unconstitutional, must be declared unconstitutional, and must be enjoined.

122.   Because CFPB has taken the position that Pisinski and Morgan Drexen are directly subject to CFPB's authority, Title X's violation of the separation of powers creates a here-and-now injury entitling Pisinski and Morgan Drexen to judicial review to ensure that any enforcement will only be by a constitutional agency accountable to the Executive.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Provide for expeditious proceedings in this action in light of CFPB's threatened actions and irreparable harm faced by Plaintiffs;

B.      Enter judgment in the Plaintiffs' favor;

C.      Declare unconstitutional the provisions of the Dodd-Frank Act creating and empowering CFPB;

D.      Provide for preliminary and permanent injunctive relief;

A.      Award the Plaintiffs their costs and reasonable attorneys' fees incurred in this action pursuant to 28 U.S.C. § 2412; and

B.      Grant Plaintiffs such other relief as the Court deems just and proper.

## <u>RESERVATION OF RIGHTS</u>

In the event that CFPB is found to be constitutional, Plaintiffs preserve their other claims, including their claims that:

a.      CFPB's application of the CFPB and the TSR to attorneys engaged in the practice of law violates the Tenth Amendment and the statutory exemption in the Dodd Frank Act, 2 U.S.C. § 5517(e);

b.      Pursuant to 5 U.S.C. § 706(2)(c), CFPB has acted "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right";

c.      The application of the CFPB and the TSR to lawyers engaged in the practice of law is arbitrary, capricious and contrary to law pursuant to 5 U.S.C. § 706(2)(a), and CFPB has failed to articulate, among other things: an explanation of how the manner in which lawyers offer services to and bill their clients can be considered a violation of the TSR or the Dodd-Frank Act; how legal services constitute a

"financial product or service," or any legally supportable basis for application of the TSR or the Dodd-Frank Act to lawyers and their staff engaged in the practice of law.

Respectfully submitted,

Dated: July 22, 2013

/s/

Randall K. Miller
D.C. Bar No. 460682
Nicholas DePalma
D.C. Bar No. 974664
Venable LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449
(703) 821-8949 (facsimile)
rkmiller@venable.com
nmdepalma@venable.com

*Counsel for Plaintiffs Morgan Drexen, Inc. and
Kimberly A. Pisinski*