# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KIMBERLY A. PISINSKI, an individual, and MORGAN DREXEN, INC., a Nevada Corporation, <br><br>             Plaintiffs, <br><br> v. <br><br> CONSUMER FINANCIAL PROTECTION BUREAU, <br><br>             Defendant. | Case No.: 13-CV-1112 <br><br> **STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION** |

Randall K. Miller
D.C. Bar No. 460682
Nicholas DePalma
D.C. Bar No. 974664
Venable LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449
(703) 821-8949 (facsimile)
rkmiller@venable.com
nmdepalma@venable.com

*Counsel for Plaintiffs Kimberly A. Pisinski and Morgan Drexen, Inc.*

# TABLE OF CONTENTS

INTRODUCTION …………………………………………………………….. 1

SUMMARY OF FACTUAL BACKGROUND ………………………………. 1

ARGUMENT ………………………………………………………………… 3

I.      LEGAL STANDARD ………………………………………………… 3

II.     PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION …….. 4

        A.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS …….. 4

                1.      THE COURT HAS THE AUTHORITY
                        TO CONSIDER THIS CASE ………………………………… 4

                2.      CFPB VIOLATES THE CONSTITUTIONAL
                        SEPARATION OF POWERS ………………………………… 5

        B.      PLAINTIFFS ARE SUFFERING IRREPARABLE HARM …………. 7

        C.      THE BALANCE OF EQUITIES FAVORS ENTRY OF
                THE PRELIMINARY INJUNCTION ………………………………….. 9

        D.      THE PUBLIC INTEREST FAVORS ENTRY OF
                A PRELIMINARY INJUNCTION ……………………………………… 10

CONCLUSION ………………………………………………………………. 12

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                    <u>Page(s)</u>

*Andrade v. Lauer*, 729 F.2d 1475 (D.C. Cir. 1984)   …………………………..   4

*Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, --- F. Supp. 2d ---,
    2013 WL 1777481 (D.D. C. Apr. 17, 2013)   …………………………………   3, 8

*Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553 (Fed. Cir. 1996)   ……   8

*Bowsher v. Synar*, 478 U.S. 714 (1986)   ……………………………………….........   4

*Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin.*, 950 F. Supp. 357
    (D.D.C. 1996) ……………………………………………………………….   10

*Elrod v. Burns*, 427 U.S. 347 (1976)   …………………………………………..   7

*Free Enter. Fund v. Pub. Co. Acct'ing Oversight Bd.*, 537 F.3d 667
    (D.C. Cir. 2008) ……………………………………………………………   4

*Free Enter. Fund v. Pub. Co. Acct'ing Oversight Bd.*, 130 S. Ct. 3138 (2010)   ……..   4, 5

*Gordon v. Holder*, --- F.3d ---, 2013 WL 3239742 (D.C. Cir. June 28, 2013)   ………   3, 10

*Hettinga v. United States*, 560 F.3d 498 (D.C. Cir. 2009)   ………………………….   4

*Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935) ……………………………..   5,6

*Illinois Central R. Co. v. Interstate Commerce Comm'n,* 206 U. S. 441 (1907) ……   6

*INS v. Chadha*, 462 U.S. 919 (1982)   …………………………………………..   5

*Mills v. District of Columbia*, 571 F.3d 1304 (D.C. Cir. 2009)   ……………………..   7

*Mistretta v. United States*, 488 U.S. 361 (1989)   …………………………………….   5

*Morrison v. Olson*, 487 U.S. 654 (1988)   ……………………………………………   5

*Myers v. United States*, 272 U.S. 52 (1926)   ……………………………………………   5

*N. Mariana Islands v. United States*, 686 F. Supp. 2d 7 (D.D.C. 2009)   …………..   10

*O'Donnell Const. Co. v. District of Columbia,* 963 F.2d 420 (D.C. Cir. 1992)   ……..   10

*Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970 (Fed. Cir. 1996)   ………………….   8

*POM Wonderful LLC* v. FTC, 894 F. Supp. 2d 40 (D.D.C. 2012)   …………………   4

# TABLE OF AUTHORITIES (cont'd)

**CASES**                                                                                          Page(s)

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359
    (Fed. Cir. 2001) ………………………………………………………..    8

*Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37 (D.D.C. 2002) ………………….   7-8, 10

*Standard Oil Co. v. United States,* 283 U. S. 235 (1931) ……………………    6

*Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106 (D.D.C. 2012) …..   3, 9, 10

*Winter v. Natural Res. Def. Council*, 555 U.S. 7 (2008) ………………………….    3

**STATUTES**

12 U.S.C. § 5491(a) ………………………………………………………….    1

12 U.S.C. § 5491(c) ………………………………………………………..    2

12 U.S.C. § 5491(c)(3) ………………………………………………………    6

12 U.S.C. § 5497(a)(1) ………………………………………………………    1

12 U.S.C. § 5497(a)(2)(B) …………………………………………………..    1

12 U.S.C. § 5497(a)(2)(C) …………………………………………………..    2

12 U.S.C. § 5531(a) ………………………………………………………….    1

12 U.S.C. § 5531(d) ………………………………………………………….    1

## INTRODUCTION

This case is about a recently-created federal agency (the Consumer Financial Protection Bureau) ("CFPB") with a novel and unconstitutional structure and which has overstepped its bounds and taken actions which threaten the very existence of the businesses of Morgan Drexen, Inc. ("Morgan Drexen") and Kimberly A. Pisinski ("Pisinski").  CFPB is a recently created agency of federal government that just days ago on July 16, 2013 had its first Director confirmed by the Senate.  CFPB has investigated Morgan Drexen and has demanded that Morgan Drexen turn over a vast collection of personal and sensitive financial data that Morgan Drexen obtained through attorney-client communications.  In addition, CFPB's approach to the investigation is that it may regulate attorneys like Pisinski who are practicing law, a state function performed by state bars.  These examples of overreach are a direct result of the fact that CFPB lacks political accountability and internal checks and balances that are constitutionally required.  Plaintiffs seek a preliminary injunction to halt CFPB's conduct until the constitutional issue can be heard.

## SUMMARY OF FACTUAL BACKGROUND

1.     Congress created CFPB through Title X of the Dodd-Frank Act.  Section 1011(a) of the Dodd-Frank Act established CFPB to regulate the offering and provision of consumer financial products or services under the federal consumer financial laws, by preventing covered persons from engaging in "unfair," "deceptive," or "abusive" practices.  12 U.S.C. § 5491(a). The Dodd-Frank Act does not define "unfair," or "deceptive," and broadly defines "abusive."  *See* Dodd-Frank Act § 1031(a), (d), 12 U.S.C. § 5531(a), (d).

2.     The Dodd-Frank Act authorizes CFPB to fund itself by unilaterally claiming funds from the Federal Reserve Board.  *See id.* at § 1017(a)(1)-(a)(2)(B), 12 U.S.C. § 5497(a)(1)-(a)(2)(B) (setting CFPB's allotment at an increasing percentage of the Federal Reserve System's operating expenses, reaching 12 percent in 2013, or approximately $597,6000,000).  Congress

4

has no "power of the purse" because Title X bars the House and Senate Appropriations Committees from attempting to "review" CFPB's self-funded budget.  § 1017(a)(2)(C), 12 U.S.C. § 5497(a)(2)(C).

3.       The President has no oversight over CFPB after appointment because CFPB's Director receives a five-year term in office and may only be removed for "inefficiency, neglect of duty, or malfeasance in office." *Id.* at § 1011(c), 12 U.S.C. § 5491(c).

4.       On March 13, 2012, CFPB issued a Civil Investigative Demand ("CID") to Morgan Drexen. *See* Declaration of Randal Shaheen ("Shaheen Decl.") ¶ 4.  CFPB's investigation of Morgan Drexen remains ongoing.  *See* Shaheen Decl. ¶¶ 4-43.

5.       Morgan Drexen is in the business of providing non-attorney paralegal support services to attorneys in the areas of debt resolution, bankruptcy, personal injury, mass tort litigation, and tax preparation.  Declaration of Walter Ledda ("Ledda Decl.") ¶ 3.  Pisinski is one of the attorneys for whom Morgan Drexen provides such services, under Pisinski's supervision and with Pisinski remaining responsible for all actions taken by Morgan Drexen in accordance with state ethics rules.  Ledda Decl. ¶ 4.  Pisinski offers clients bankruptcy services.  Declaration of Kimberly Pisinski ("Pisinski Decl.") ¶ 2.  As part of any bankruptcy engagement, Pisinski's clients may elect for her to first amicably resolve their debts with creditors prior to filing a bankruptcy petition. *Id.*

6.       During CFPB's investigation, it has taken the position that Morgan Drexen cannot continue to provide services to attorneys such as Pisinski.  Shaheen Decl. ¶ 43.  CFPB has refused to accept any resolution short of Morgan Drexen refusing to support attorneys engaged by clients for both bankruptcy counseling and debt settlement. *Id.* ¶ 43.  CFPB has further demanded that Morgan Drexen provide confidential information belonging to the bankruptcy

clients of the attorneys supported by Morgan Drexen, in violation of the attorney's wishes and their ethical obligations to protect client confidences. *Id.* ¶ 43.

7.    During CFPB's investigation, CFPB has caused Morgan Drexen to divert substantial attention and resources and to incur attorney's fees.  CFPB also has threatened the viability of Morgan Drexen's business. *See* Ledda Decl. ¶¶ at 13-14.

## ARGUMENT

**I.    LEGAL STANDARD**

Plaintiffs are entitled to a preliminary injunction because (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary relief"; (3) "the balance of the equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Gordon v. Holder*, --- F.3d ---, 2013 WL 3239742, at *3 (D.C. Cir. June 28, 2013) (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)) (affirming grant of preliminary injunction).

This Court has previously balanced the four factors on a "sliding scale" whereby "a lesser showing on one factor could be surmounted by a greater showing on another factor." *See Bayer HealthCare, LLC v. U.S. Food & Drug Admin.*, --- F. Supp. 2d ---, 2013 WL 1777481, *4-5 (D.D. C. Apr. 17, 2013) (granting in part motion for temporary restraining order).  However, the Supreme Court's decision in *Winter* has called this approach into question. *Id.*; *see also Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 113 n.6 (D.D.C. 2012) (employing the pre-*Winter* sliding scale analysis).  Here, Plaintiffs are entitled to a preliminary injunction under either the sliding-scale approach or the *Winter* standard.

II.     **PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION**

   A.     **Plaintiffs Are Likely To Succeed On The Merits**

         1.     **The Court Has The Authority to Consider This Case**

Targets of agency investigations and enforcement actions are often required to exhaust their administrative remedies before seeking relief or review in federal court.  However, when (as here) there are important constitutional and public interests at stake, the Court may consider the case.  *See Free Enter. Fund v. Pub. Co. Acct'ing Oversight Bd.*, 537 F.3d 667, 670-71 (D.C. Cir. 2008), *aff'd in relevant part*, 130 S. Ct. 3138, 3150-51 (2010) (permitting a party to proceed in federal court on a challenge to the constitutionality of an agency's implementing statute without first exhausting administrative remedies); *Bowsher v. Synar*, 478 U.S. 714, 727 n.5 (1986) (concluding that a separation of powers violation may create a "here-and-now" injury that can be remedied by a court prior to completion of administrative remedies); *Andrade v. Lauer*, 729 F.2d 1475, 1490-93 (D.C. Cir. 1984) (reversing dismissal and holding that plaintiffs could bring their constitutional claim in federal court without first exhausting administrative remedies). *See also Hettinga v. United States*, 560 F.3d 498, 504 (D.C. Cir. 2009) ("Prudential exhaustion is not required where . . . an agency may not be empowered to grant relief, for example because it lacks institutional competence to resolve the particular type of issue presented, such as the constitutionality of a statute") (internal citations and quotations omitted); *but see POM Wonderful LLC* v. FTC, 894 F. Supp. 2d 40, 44-45 (D.D.C. 2012) (considering discretionary factors and declining to permit declaratory relief).

Here, unlike a plaintiff who challenges a typical agency enforcement proceeding, Plaintiffs' constitutional challenge relates to the foundational authority of CFPB as an institution

– a question that has been raised[1] but not passed upon by any court.  The Court should exercise its discretion to confront these foundational questions now.

### 2.    CFPB Violates The Constitutional Separation of Powers

The structure of CFPB is unprecedented in that CFPB is greatly insulated from the political branches (the President and Congress) and lacks internal checks and balances.  In fact, CFPB is so "independent" that it is not sufficiently accountable to the political actors to survive constitutional scrutiny.  In a series of cases, the Supreme Court has established that the Constitution – and the basic architecture of federal government power in Articles I, II, and III, require that federal agencies be subject to oversight by the political branches, with their actions subject to judicial review.  *See Free Enter. Fund*, 130 S. Ct. at 3151-61 (2010) (invalidating the double layer of insulation protecting executive branch officials from Presidential removal); *Myers v. United States*, 272 U.S. 52 (1926) (holding that Congress may not interfere with Presidential removal of executive branch officials like the postmaster general).  *See also Mistretta v. United States*, 488 U.S. 361, 423-24 (1989) (Scalia, J. dissenting); *Morrison v. Olson*, 487 U.S. 654, 708-09 (1988) (Scalia, J. dissenting); *INS v. Chadha*, 462 U.S. 919, 945 (1982); *Humphrey's Ex'r v. United States*, 295 U.S. 602 (1935).

As set forth in the attached Declaration of Law Professor Todd Zywicki, there are four structural features of CFPB that impermissibly insulates CFPB from required accountability.  First, CFPB is headed by a single director who serves a fixed term of five years and is removable only for "cause" (and not "at will" by the President).  Second, CFPB is not subject to Congressional oversight through the budget and appropriations process; instead, CFPB automatically receives a fixed sum that it can use to carry out its activities – up to a twelve

---

[1] *See State Nat'l Bank of Big Spring v. Gethner*, No. 1:12-cv-01032-ESH (D.D.C.).

percent (12%) cap of the Federal Reserve's total operating expenses.  Third, CFPB is insulated

from accountability from the Federal Reserve Board itself, which does not review or approve

CFPB actions.  Fourth, and finally, the Dodd Frank Act limits judicial review over CFPB

actions.  *See* Zywicki Decl. ¶¶ 13-20.  Such a structure is unprecedented in the federal

government.  CFPB is simply insufficiently accountable to the political branches of government

and therefore the structure of CFPB violates the Constitution.

Cases have established two different types of agency structures that comply with the

Constitution: executive agencies (or departments) and independent agencies. CFPB is not

structured properly as either an executive agency or independent agency.

For executive agencies, the head of the agency typically serves at the pleasure of the

President and is removable at will by the President. This is not the case for CFPB, which limits

removal of its director to "for cause," which Dodd-Frank defines as "inefficiency, neglect of

duty, or malfeasance in office." 12 U.S.C. § 5491(c)(3). Thus, it is not properly structured as to

be constitutional as an executive agency.

For so-called "independent agencies," accountability is provided with other features such

as a multi-member bipartisan structure, such as the Federal Trade Commission.  As Professor

Zywicki observes, a multi-member bipartisan commission structure is usually identified as a

defining feature of an independent agency.  *See* Zywicki Decl. ¶ 16; *see also Humphrey's Ex'r*,

295 U.S. at 624 ("The commission is to be *nonpartisan*, and it must from the very nature of its

duties, act with entire impartiality. . .  Like the Interstate Commerce Commission, its members

are called upon to exercise the trained judgment of a *body of experts* 'appointed by law and

informed by experience.'" (quoting *Illinois Central R. Co. v. Interstate Commerce Comm'n, 206

U. S. 441 (1907); Standard Oil Co. v. United States,* 283 U. S. 235 (1931)).  In addition,

independent agencies typically are accountable to Congress through the appropriations process, but CFPB is not.

CFPB conforms to neither of these models of recognized agency structure and accountability: it is neither an executive agency nor an independent agency. It is effectively an independent agency housed inside another independent agency, isolated from effective accountability to Congress, the President, or the Federal Reserve Board.  Indeed, CFPB lacks even the limited accountability that the PCAOB had to the Securities and Exchange Commission—a structure that was nevertheless held to be unconstitutional. CFPB can spend money, issue regulations, and bring enforcement actions with no accountability to any elected officials or bipartisan agency, a recipe for the sort of abusive and overreaching behavior exhibited in this case.  As Professor Zywicki states, "CFPB [is] one of the most powerful and publicly unaccountable agencies in American history" (Zywicki Decl. ¶ 17) — in fact, wielding so much unaccountable power and discretion as to be unconstitutional.

Accordingly, Plaintiffs are likely to succeed in demonstrating that CFPB's enabling statute should be declared unconstitutional.

**B.     Plaintiffs Are Suffering Irreparable Harm**

Plaintiffs are subject to an ongoing, invasive, and coercive inquisition by a purported government agency that does not possess the constitutionally-required structure to survive a separation of powers analysis.  Courts have consistently held that a colorable constitutional violation gives rise to a showing of irreparable harm.  *See Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (a constitutional violation and loss of constitutional protections "'for even minimal periods of time, unquestionably constitutes irreparable injury'") (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); *see also Seretse-Khama v. Ashcroft*, 215 F. Supp. 2d 37, 53

(D.D.C. 2002) (deprivation of constitutional protection "is an undeniably substantial and irreparable harm").

As explained in the Declaration of Morgan Drexen's Chief Executive Officer, Walter Ledda, CFPB's conduct, including issuing CIDs to attorneys supported by Morgan Drexen, labeling Morgan Drexen's business model as a violation of law, and demanding information belonging to the clients of attorneys supported by Morgan Drexen, threatens the very existence of Morgan Drexen's business. *See* Ledda Decl. ¶ 10.  To date, CFPB's actions have caused Morgan Drexen to suffer reputational harm, loss of credit facilities, and significantly increased the costs of doing business. *Id.* ¶ 14.

In *Bayer HealthCare, LLC*, this Court enjoined the FDA based on the threat of eroding Bayer's market share with respect to a single drug, which would lead to "price erosion, deep drops in revenues, loss of valuable customer relationships, loss of research and development funds, and fewer revenue-generating future products in the pipeline."  --- F. Supp. 2d ---, 2013 WL 1777481, at *7 (citing to Bayer's declarations).  There, this Court observed that "[c]ourts have acknowledged that price erosion and diminished market share can constitute irreparable harm." *Id.* (citing *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed. Cir. 2001); *Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 975-76 (Fed. Cir. 1996); *Bio-Technology Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996)).

Here, as explained by Mr. Ledda, Morgan Drexen has far more at stake than the profit on a single drug.  *See* Ledda Decl. ¶ 13 ("[A]ny requirement that Morgan Drexen stop providing these services to attorneys would threaten the viability of Morgan Drexen's business.")

In addition, CFPB's demand for the personal information of clients of the attorneys supported by Morgan Drexen is particularly troubling.  Plaintiffs receive their clients' personal

financial data pursuant to the attorney-client privilege.  CFPB has taken the position that Morgan

Drexen must produce such data in violation of the privilege and confidentiality that attorneys

(and by extension, Morgan Drexen) owe to their clients.  Most recently, CFPB has demanded

production of personal financial data that Morgan Drexen's attorney clients have received from

their clients to evaluate potential bankruptcy filings.  *See* Shaheen Decl. Ex. 35 (requesting "data

relating to consumers who entered into bankruptcy contracts with Morgan Drexen-affiliated

attorneys").  CFPB's demand for such information presents Plaintiffs with a Hobson's choice:

either produce the confidential data (thus violating Plaintiffs' ethical obligations) or refuse to

produce the documents and face CFPB retribution.  *See Tyndale House Publishers, Inc.*, 904 F.

Supp. 2d at 122 (holding in connection with the contraceptive mandate "places the plaintiffs in

the untenable position of choosing either to violate their religious beliefs by providing coverage .

. . or to subject their business to the continual risk of the imposition of enormous penalties for

noncompliance.  Such a threat to the very continued existence of the plaintiff's' business

necessarily . . . creates . . . such a Hobson's choice . . . .").

        CFPB should be enjoined until such time as the Court can address the very serious

constitutional issues raised by Plaintiffs' case.

### C.    The Balance of Equities Favors Entry of the Preliminary Injunction

         In contrast to the substantial irreparable harm facing Plaintiffs, there can be no credible

claim of harm to CFPB.  CFPB is already defending against constitutional challenges to its

structure, both in this Court and in Congress.  Unless and until such challenges are resolved,

CFPB should not be permitted to act, particularly where, as here, there are legitimate questions

of agency overreach.  If the Court grants the preliminary injunction, CFPB simply will have to

wait until such challenge is resolved before proceeding against Morgan Drexen.

**D.      The Public Interest Favors Entry Of A Preliminary Injunction**

Given CFPB's fundamental structural defects and likely constitutional violations, the public interest will be served if this Court preliminarily enjoins CFPB from acting.

Where, as here, there is a new federal agency that has an unconventional and novel structure that poses legitimate and unaddressed constitutional questions, a preliminary injunction to allow for the evaluation of such questions serves the public interest. *See Gordon*, --- F.3d ---, 2013 WL 3239742, at *9 (D.C. Cir. 2013) (affirming district court's determination that the public interest weighed in favor of an injunction by concluding that "enforcement of a potentially unconstitutional law that would also have severe economic effects it not in the public interest."); *Tyndale House Publishers, Inc.*, 904 F. Supp. 2d at 130 (holding that "there is undoubtedly . . . a public interest in ensuring that the rights secured under the First Amendment . . . are protected"); *O'Donnell Const. Co. v. District of Columbia,* 963 F.2d 420, 429 (D.C. Cir. 1992) (holding that "issuance of a preliminary injunction would serve the public's interest in maintaining a system of laws" free of constitutional violations). *See also Seretse-Khama,* 215 F. Supp. 2d at 54 (holding that the public interest is served by a court order that avoids "serious constitutional risks"); *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 21 (D.D.C. 2009) (noting "the general public interest served by agencies' compliance with the law"); *Cortez III Serv. Corp. v. Nat'l Aeronautics & Space Admin.*, 950 F. Supp. 357, 363 (D.D.C. 1996) (public interest served by enforcing constitutional requirements).

In addition, as evidenced by the uproar over the National Security Agency's data collection, there is a strong public interest in protecting the personal financial data of consumers from unjustified government collection and aggregation.  Concerns over CFPB's data-mining and aggregation have been voiced by United States senators, law professors, and various watchdog groups. *See* Letter from Sen. Mike Crapo to Gene Dodaro (July 2, 2013) (attached as Exhibit A)

13

(requesting that the Government Accountability Office review CFPB because "[t]he size and scope of this data collection warrant proper government oversight to both guard consumers' privacy and ensure that the CFPB is acting within its existing authority"); Letter from K. Siggerud to M. Crapo (July 12, 2013) (attached as Exhibit B) stating that GAO "accepts your request" and would "begin the work shortly"); Bobb Unruh, *Now Obama Watching American's Credit Cards*, WND.com (quoting Judicial Watch President Tom Fitton as saying CFPB's actions are "a more direct assault on American citizens' reasonable expectation of privacy than the gathering of general phone records") (available at http://www.wnd.com/2013/06/now-obama-watching-americans-credit-cards/) (last visited July 22, 2013); Letter from David T. Hirschman to R. Cordray at p. 6 (June 19, 2013) (attached as Exhibit C) (stating that "[W]e believe the Bureau's data demands are unlawful"); Brendan Bordelon, *Consumer Financial Protection Bureau compared to NSA*, The Daily Caller (June 26, 2013) (available at http://dailycaller.com/2013/06/26/consumer-financial-protection-bureau-compared-to-nsa/) (last visited July 22, 2013) (quoting scholar John Berlau as saying that CFPB's data collection activities constitute "an NSA-style surveillance program without any serious justification, such as terrorism"); Randy E. Barnett, Editorial, *The NSA's Surveillance is Unconstitutional*, WALL ST. J., Jul 11, 2013, at A13 (NSA and CFPB's activities "dangerously violate[] the most fundamental principles of our republican form of government" and "[t]he secrecy of these programs makes it impossible to hold elected officials and appointed bureaucrats accountable.").

Stopping CFPB from demanding that Morgan Drexen produce consumer financial information (information belonging to attorney bankruptcy clients) furthers the public's privacy interest.

## **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction and for such other relief that the court deems equitable.  A proposed order is attached.

Respectfully submitted,

Dated:  July 22, 2013

_____/s/_____

Randall K. Miller
D.C. Bar No. 460682
Nicholas DePalma
D.C. Bar No. 974664
Venable LLP
8010 Towers Crescent Drive, Suite 300
Tysons Corner, VA 22182
(703) 905-1449
(703) 821-8949 (facsimile)
rkmiller@venable.com
nmdepalma@venable.com

*Counsel for Plaintiffs Kimberly A. Pisinski and Morgan Drexen, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on July 22, 2013, a copy of the foregoing document was filed

electronically via the Court's ECF system, through which a notice of the filing will be sent to all

counsel of record.

I further certify that a paper copy of the foregoing document was hand-delivered upon the

following:

Ronald C. Machen, Jr.
United States Attorney for the District of Columbia
c/o Civil Process Clerk, 555 4th Street, N.W.
Washington, D.C. 20530

Eric H. Holder, Jr.
Attorney General of the United States
Department of Justice Room D103950
Pennsylvania Avenue, N.W.
Washington, D.C. 20530-0001

Consumer Financial Protection Bureau
ATTN:  Clerk for Legal Service of Process,
1700 G. Street, N.W.
Washington, D.C. 20552

_____/s/_____
Randall K. Miller

6936084

# Exhibit A

TIM JOHNSON, SOUTH DAKOTA, CHAIRMAN

JACK REED, RHODE ISLAND
CHARLES E. SCHUMER, NEW YORK
ROBERT MENENDEZ, NEW JERSEY
SHERROD BROWN, OHIO
JON TESTER, MONTANA
MARK WARNER, VIRGINIA
JEFF MERKLEY, OREGON
KAY HAGAN, NORTH CAROLINA
JOE MANCHIN, WEST VIRGINIA
ELIZABETH WARREN, MASSACHUSETTS
HEIDI HEITKAMP, NORTH DAKOTA

MICHAEL CRAPO, IDAHO
RICHARD C. SHELBY, ALABAMA
BOB CORKER, TENNESSEE
DAVID VITTER, LOUISIANA
MIKE JOHANNS, NEBRASKA
PATRICK J. TOOMEY, PENNSYLVANIA
MARK KIRK, ILLINOIS
JERRY MORAN, KANSAS
TOM COBURN, OKLAHOMA
DEAN HELLER, NEVADA

CHARLES YL STAFF DIRECTOR
GREGG RICHARD, REPUBLICAN STAFF DIRECTOR



**United States Senate**

COMMITTEE ON BANKING, HOUSING, AND
URBAN AFFAIRS

WASHINGTON, DC 20510–6075

July 2, 2013

The Honorable Gene Dodaro
Comptroller General
U.S. Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Comptroller Dodaro:

As the Ranking Member of the Senate Committee on Banking, Housing and Urban Affairs, I recently participated in a hearing to gain insight into the Consumer Financial Protection Bureau's ("CFPB") actions, including its wide-spread data collection of consumers' financial information.  I learned through news reports that the CFPB has allocated more than $20 million for collecting and tracking spending habits of more than 10 million Americans.  Subsequent information I have received indicates the scope of this data collection may be far greater than this.  The size and scope of this data collection warrant proper government oversight to both guard consumers' privacy and ensure that the CFPB is acting within its existing authority.

The law that established the CFPB expressly prohibits gathering or analyzing the personally identifiable financial information ("PII") of consumers except for very limited purposes.  While CFPB officials have stated the CFPB is not collecting PII, we do not know what information it collects, on how many accounts, or how this information is being used.  We also need to know whether the CFPB is truly not collecting PII from the data it is collecting or purchasing.  In addition to regulatory and privacy concerns, this also raises data security issues especially since the CFPB's Inspector General has already identified deficiencies in this area.  We need to know what safeguards are in place to prevent the collection or use of the data it is collecting.

For these reasons, I request that the GAO investigate CFPB's data collection to determine its purpose, scope and intended use; specific legal authority pursuant to which the CFPB is collecting consumers' data; how the CFPB secures and protects information it collects; the purchase and use of data from third parties and contractors; and the cost of this data collection for both the CFPB and the institutions that are

The Honorable Gene Dodaro
Comptroller General
U.S. Government Accountability Office
Page 2

providing information.  For your reference, a non-exclusive list of specific issues for GAO to consider is attached to this letter.

Thank you for your prompt attention to these important matters. Should you have any questions, please contact me or Jelena McWilliams or Jared Sawyer of my staff at 224-7391.

Sincerely,

Mike Crapo
Ranking Member

## Attachment

### List of Items for GAO to Consider When Studying CFPB's Data Collection Efforts

*Statutory limitations / legal authority*

- Under what legal authority is the CFPB requesting and collecting consumer information?

- Does the CFPB differentiate data it obtains through its supervisory authority from data collected vis-a-vis different authority, and if so, how?  Does its store data separately?

- What internal policies and procedures has the CFPB adopted to ensure whether data collected pursuant to one authority can be used under a separate authority?

- Does the CFPB inform institutions being examined when data are collected for purposes unrelated to the exam?

- Are there internal firewalls for storing and using consumer data CFPB collects for supervisory, enforcement, research and regulatory purposes, or does the CFPB use data it collects for multiple purposes?

- How does the CFPB plan to utilize the data it collects in each of the following areas: (i) research and analysis, (ii) supervision, (iii) enforcement, and (iv) regulation?

- How does the CFPB plan to ensure that PII obtained through the consumer complaint process is not used contrary to limitations on such information under the CFPB's rulemaking authority?

*Scope and Purpose*

- How many accounts are being monitored and how many Americans?

- How many financial institutions have been asked to provide consumer data to the CFPB, and how many of them are currently doing so?

- Did any institutions refuse to provide consumer data to the CFPB, and if so, what alternative methods is the CFPB employing to obtain such data?

- How many pieces of information has the CFPB collected to date?  How many pieces of information is the CFPB collecting on a monthly basis?  How many specific data points has the CFPB requested of the participating banks?

- What data is the CFPB collecting in each category, including but not limited to: mortgages, home equity lines of credit, credit cards, checking accounts,

overdrafts, student lending (private), student lending (government), deposit advances, payday loans, remittances, prepaid cards, medical debt?

- Who does the CFPB purchase consumer data from and how does CFPB utilize vendors and third party contractors for data collection and analysis purposes?

- What is the legal standing of third party contractors with respect to CFPB and to the financial institutions from which the data is collected?

- Does the CFPB use Memoranda of Understanding (MOUs) with other federal banking regulators to access data that it does not have the ability and/or authority to collect directly?

- Are CFPB's data collection efforts subject to the Paperwork Reduction Act (PRA) which requires OMB review and does the use of MOUs bypass PRA requirements?

- Why is it necessary to demand all consumer account data instead of an anonymous representative sample?

- What does the CFPB intend to do with it?

- In what other areas does the CFPB collect, or plan to collect, consumer data?

- Is the amount of data and the frequency of the data collection appropriate for the specific stated purposes by CFPB for how the agency intends to use the data? Does the CFPB have the authority to collect data for sake of collecting data with no intended stated purpose?

- How much does the agency spend annually on this data collection?

- Is the data collected in the course of CFPB's supervision duplicative or overlapping with data collected by the institutions' prudential regulators?   If so, has the CFPB coordinated with prudential regulators to eliminate or minimize such duplication?

- Whether forcing financial institutions to disclose this information would cause them to violate their legal obligations to protect the privacy of their customers' personal information?

### *Privacy*

- Is it possible for the CFPB, or any third party vendor working on behalf of the CFPB, to reverse engineer raw data to identify individual consumers?

- Does a third party data aggregator, working on behalf of the CFPB, receive any PII?

- What are the policies and procedures of a third party data aggregator, working on behalf of the CFPB, to aggregate data received from institutions?

- Has the CFPB set a time period for retaining this data, and will the individual consumer transaction information be purged from all federal records after this retention period?

- With regard to medical debt data collected by the CFPB, is the collection related to the supervisory or examination oversight of issuers of debt?  Does the type of data collected reveal the type of medical procedures/conditions of consumers?

- Does the CFPB share this information with any outside third parties?  Are these outside third parties under contract with the CFPB?

### Data Security

- How is the CFPB ensuring that the consumer information it collects is kept secure?

- Has the CFPB suffered any breaches of data, and has any data breach reached consumer information?

- The CFPB's Office of the Inspector General ("OIG") 2012 Audit of the CFPB's Information Security Program raised concerns with the CFPB's internal data security.  What is the progress of the CFPB's implementation of information security recommendations from the OIG?

- What specific measures has the CFPB taken to ensure its third-party vendors are protecting consumers' data?

### Cost-Benefit Analysis

- Has the CFPB conducted any cost-benefit analysis to determine the cost of the data requests and production on the institutions?

- Has the CFPB solicited feedback from any institutions about the cost of these data requests and production?  Have any financial institutions volunteered or shared with the CFPB that information?  What is the cost of this data production, both initially and on-going, for institutions that are furnishing data to the CFPB?

- With respect to the Paperwork Reduction Act and other laws, Office of Management and Budget has set forth certain parameters for surveys and data collection.  Has the CFPB obtained the OMB approval document for this data collection effort?  If not, why not?

# Exhibit B

# GAO

U.S. GOVERNMENT ACCOUNTABILITY OFFICE

**441 G St. N.W.**
**Washington, DC  20548**

July 12, 2013

The Honorable Mike Crapo
Ranking Member, Committee on Banking, Housing, and Urban Affairs
United States Senate

Dear Senator Crapo:

Thank you for your letter of July 2, 2013, requesting that the Government Accountability Office review the Consumer Financial Protection Bureau's data collection efforts.

GAO accepts your request as work that is within the scope of its authority. Your request has been assigned to Ms. Orice Williams Brown, Managing Director, Financial Markets and Community Investment and staff are available to begin the work shortly. Ms. Brown or a member of her team will contact Ms. Jelena McWilliams or Mr. Jared Sawyer to discuss the request, your needs, and the engagement objectives, scope, and methodology in accordance with GAO's protocols. As applicable, we will also be in contact with the cognizant Inspector General's office to ensure that we are not duplicating efforts. If an issue arises during this coordination, we will consult with you regarding its resolution.

If you have any questions, please contact Ms. Brown at 202-512-5837 or Mr. Paul Thompson, Assistant Director, Congressional Relations, on my staff at 202-512-9867.

Sincerely yours,

Katherine Siggerud
Managing Director for
Congressional Relations

cc:    Ms. Jelena McWilliams
       Mr. Jared Sawyer

Ref:  CCAR 13-0813

# Exhibit C



**DAVID T. HIRSCHMANN**
PRESIDENT AND CHIEF EXECUTIVE OFFICER

1615 H STREET, NW
WASHINGTON, DC 20062-2000
(202) 463-5609 | (202) 463-3129 FAX

June 19, 2013

The Honorable Richard Cordray
Director
Consumer Financial Protection Bureau
1700 G Street, NW
Washington, DC  20552

Dear Director Cordray:

I am writing with respect to the increasing number of requests by representatives of the Consumer Financial Protection Bureau (Bureau) that companies subject to the Bureau's regulatory authority provide huge quantities of data regarding individual consumers' financial transactions on an ongoing, real-time basis.  We first raised this issue in our February 14 letter to you.  It has since been the subject of a *Bloomberg News* report and of questions asked by several Senators during your April 23 appearance before the Senate Committee on Banking, Housing, and Urban Affairs.

We agree with you that data is important in determining whether there is a sound basis for regulation and how regulation should be structured, and recognize that Congress conferred specific authority on the Bureau to collect data to inform the Bureau's use of its regulatory authority.  The exercise of this data collection authority, however, requires great care and clear guidelines to ensure all data collection is conducted in a responsible manner, and in full compliance with the law.

To date, the Bureau's lack of transparency around its data collection efforts makes it very difficult to evaluate the prudence and the legality of the collection process; the strength of the security measures the Bureau is taking to protect consumers' data; the extent to which personally identifiable information is being collected, stored, analyzed, or shared; the extent to which such requests are being fully coordinated at senior levels of the Bureau to avoid redundancy; and the cost burden imposed on, and potential liability exposure incurred by companies subject to the Bureau's requests.

The Honorable Richard Cordray
June 19, 2013
Page 2

Based on your public statements, it appears that these demands may violate specific limits on the Bureau's authority set forth in the Dodd-Frank Act:

- The statute requires that the Bureau issue an order or regulation in order to collect this information, but the Bureau has done neither.

- The statute restricts the Bureau's ability to collect consumers' personally-identifiable information, but it is not clear that the Bureau has in place appropriate safeguards to ensure compliance with that limitation.

Moreover, compliance with the Bureau's demands not only imposes significant costs on companies—because the Bureau's specifications require companies to reconfigure existing data files and bear the expense of providing those files to the Bureau on a continuing basis—but also threatens companies with reputational damage, and perhaps litigation exposure, because of significant questions about the Bureau's ability to maintain the confidentiality of this information as well as the Bureau's legal authority to require companies to provide it.

I urge you to address these issues expeditiously, transparently, and in detail.  It is the right thing to do given the concern and confusion about the Bureau's data collection efforts.  Only a full accounting will clear the air.  In addition, because it appears the Bureau is requesting this data during the supervision process—which the statute properly makes confidential—companies are effectively put to the choice of complying with questionable demands by government, and potentially exposing their customers' confidential information to public disclosure, or refusing to comply and running the risk that the Bureau will take formal or informal supervisory or enforcement action against the company for failing to comply.  Moving these data collection programs into the daylight will ensure they are properly overseen and accountable to the Congress and the American people.

The Honorable Richard Cordray
June 19, 2013
Page 3

<u>Background and Questions</u>

As the *Bloomberg News* article reported, the Bureau has issued multiple demands for data regarding individual consumer transactions in a variety of different areas.[1] Most significantly, we understand that the Bureau is directing at least some credit card issuers to provide—on a real-time, continuous basis—a monthly summary of cardholder transactions on an account-by-account basis. We have heard from companies that the scope may range from dozens to as many as hundreds of pieces of data for each consumer on at least a monthly (and perhaps more frequent) basis.

We also understand that the Bureau either has implemented or is planning to implement a data system that assigns an identifier to each individual and requires all companies submitting data regarding that individual to tag the data with the same identifier (the consumer's name is not requested). If this is true, it will allow the Bureau to construct a profile of each individual consumer's financial activities by grouping together all of that consumer's credit card transactions.

In addition, we are told that the Bureau may be seeking to expand these requests to include additional categories of financial data, such as mortgage or other loan transactions. If the Bureau does take this step, that will enable the Bureau to construct even more detailed profiles of individuals' financial activities.

This partial description of the Bureau's data collection program is based on feedback from regulated companies, published news reports, and limited public statements from Bureau officials, but the lack of transparency around the Bureau's data collection efforts leaves unanswered a number of very important questions, including:

1. How many/which data fields are being requested?

2. Is each company asked for the same fields?

---

[1] *See* Carter Dougherty, *U.S. Amasses Data on 10 Million Consumers as Banks Object* (Apr. 17, 2013), *available at* http://www.bloomberg.com/news/print/2013-04-17/u-s-amasses-data-on-10-million-consumers-as-banks-object.html.

The Honorable Richard Cordray
June 19, 2013
Page 4

3. Has there been a process to determine if each of the fields is needed in order to support the Bureau's congressionally authorized functions, and have you reviewed these fields to make sure that they cannot be used to re-identify personally identifiable data?

4. How frequently are companies required to send this data?

5. Has the Bureau implemented a system of identifiers for individual consumers that enable it to aggregate an individual's accounts and thereby construct a profile of all of the individual's borrowing activities?

6. Is the Bureau seeking similar individual account or transaction-level data—again on a continuous, ongoing basis—regarding mortgages and other types of consumer loans and other consumer financial transactions?

7. What is the legal authority for the Bureau's collection of this data?  Why has the Bureau chosen not to use a transparent process—such as issuance of a rule or order—as the statute appears to require, so that the Bureau's data demands and its justification for those demands and security procedures to protect the data would be: (a) available to the public; (b) subject to due process protections, including review by a court if appropriate; and (c) applied equally across similarly-situated businesses?

8. Can the Bureau share this data with other Federal agencies?  State agencies?  Non-government researchers?

9. How is this data being warehoused and at what cost?

10. What policies, procedures and ongoing training has the Bureau put into place to prevent even an attempt at re-identification of depersonalized data and to prevent unauthorized access by Bureau personnel, contractors, or other persons whose job responsibilities do not require access to such data?  What is the third-party oversight mechanism for ensuring that these policies and procedures are adhered to by Bureau employees?  Beyond training and third-party oversight, has the Bureau instituted a whistle-blower program to

The Honorable Richard Cordray
June 19, 2013
Page 5

ensure that employees can report efforts to re-identify data and if so to whom are such communications sent?

<u>Lack of Statutory Authority</u>

You testified at the April 23 hearing that the Bureau's reason for collecting this data is to be able "to do the kind of very meticulous cost-benefit analysis [Congress wants] us to do as we write rules, so we can get them right."  You also stated that "[w]e have an interest in making sure that the studies and reports Congress is asking us to do to help inform your policy decisions, which is the law that we follow, are on sound grounds and that we can see over time whether the objectives you're trying to achieve are being achieved."[2]

The statute specifically addresses the Bureau's authority to collect data for use in connection with rulemaking and the preparation of reports to Congress.  The Bureau may

"require covered persons and service providers participating in consumer financial services markets to file with the Bureau, under oath or otherwise, ***in such form and within such reasonable period of time as the Bureau may prescribe by rule or order***, annual or special reports, or answers in writing to specific questions, furnishing information [regarding the organization, business conduct, markets, and activities of covered persons and service providers], as necessary for the Bureau to fulfill the monitoring, assessment, and reporting responsibilities imposed by Congress." Section 1022(c)(4)(B),12 U.S.C. § 5512(c)(4)(B) (emphasis added).

Congress's decision to require the Bureau to issue an order or rule in order to require companies to provide this information has three important purposes:

---

[2] You repeated these explanations several times during the hearing, for example:  "You all want us to write rules where we have careful assessment of costs and benefits. If we don't have data and information about what -- what the impacts in these markets are, we can't do that. We can't do our job.  And I think you would be quite dissatisfied with us and rightly so."

The Honorable Richard Cordray
June 19, 2013
Page 6

(1) businesses burdened by these requirements can obtain judicial review of requests that are beyond the Bureau's authority, unjustifiably burdensome, or otherwise improper; (2) the obligation to provide data will be public, so that Congress and other interested parties may assess the legitimacy of the Bureau's interest and burden imposed by such requirements; and (3) the Bureau must explain, and potentially justify in court, any distinctions in requests targeting specific businesses or types of businesses.[3]

The Bureau has not issued an order or a regulation imposing upon businesses an obligation to provide account-level data on an ongoing basis.  Because it has failed to comply with this statutory requirement, we believe the Bureau's data demands are unlawful.

I hope you will recognize this reality and—to the extent the Bureau wishes to require the provision of this data—that you will utilize the transparent processes specified in the statute for the imposition of such an obligation.[4]

Violation of Prohibition Against Collection of Personally-Identifiable Information

With respect to the collection of information for use in rulemaking and preparing reports to Congress—the purposes identified in your April 23 testimony— the statute flatly bars the Bureau from "obtain[ing] records from covered persons and service providers participating in consumer financial services markets for purposes of

---

[3] The statute also authorizes the Bureau to collect already-available information (including, presumably, by purchasing information) and to request that information be provided voluntarily through "surveys and voluntary interviews" (Section 1022(c)(4)(A), 12 U.S.C. § 5512(c)(4)(A))—but the issue here involves data that the Bureau is demanding from companies subject to its regulatory authority, not the Bureau's purchases of information from third parties or its use of information obtained through voluntary participation in surveys.

[4] Even if the Bureau were to try to claim that it is demanding this information pursuant to its supervision authority—in contradiction of your April 23 testimony—it still would lack the statutory authority to do so.  *First*, the Bureau could not avoid the rule/order requirement by asserting that it is also collecting the information for "supervision purposes." That would render meaningless Congress's requirement of an order or rule, because the Bureau could claim a dual purpose in every case and avoid the transparency and judicial review requirements that Congress intended to impose.  *Second*, to the extent the Bureau requires nondepository institutions "to generate, provide, or retain records for the purposes of facilitating supervision of such persons and assessing and detecting risks to consumers" it must do so by issuing a regulation—the preceding subparagraph states that "[t]he Bureau shall ***prescribe rules to facilitate supervision*** of [nondepository institutions subject to supervision] and assessment and detection of risks to consumers," making clear that any such requirement must be imposed through a rule.  Section 1024(b)(7) (A) &(B), 12 U.S.C. § 5514(b)(7)(A) & (B) (emphasis added).

The Honorable Richard Cordray
June 19, 2013
Page 7

gathering or analyzing the personally identifiable financial information of consumers." Section 1022(c)(4)(C), 12 U.S.C. § 5512(c)(4)(C).[5]

You have taken the position that the Bureau is not obtaining personally identifiable information because an individual's name and address are not attached to the information received by the Bureau. But the critical question is the extent to which the Bureau has protections in place that will prevent the linkage of this information to an individual's personal identity—given the clear restrictions on the Bureau's authority in this area. Neither you nor the Bureau have given any assurances regarding this extremely important question.

Cost Burden and Potential Risk of Disclosure

The Bureau's data demands will impose very significant costs on the businesses required to provide these huge quantities of information. As a threshold matter, the Bureau's directives require that information be reformatted to the Bureau's specifications, a process that imposes significant costs on companies. In addition, the Bureau's requirement that this information be provided on an ongoing basis also produces substantial continuing costs.

Much more importantly, businesses have real concerns about the Bureau's ability to safeguard this data. As you know, the Government Accountability Office has expressed concern about the security of the Bureau's data and information systems.[6] Companies that have inquired about the Bureau's security procedures in connection with these data demands have also found that those procedures are below the standards in the industry.

---

[5] The statute contains a second limitation on the Bureau's collection and use of such information that applies to its supervision authority. Section 1022(c)(9)(A), 12 U.S.C. § 5512(c)(9)(A), provides that "[t]he Bureau may not obtain from a covered person or service provider any personally identifiable financial information about a consumer from the financial records of the covered person or service provider." That limitation contains two exceptions, neither of which is applicable to these demands. *First*, if the consumer provides written permission for the disclosure—but the Bureau has not obtained such permission. *Second*, if the request is "specifically permitted or required under other applicable provisions of law" and complies with the standards for such government requests set forth in the Right to Financial Privacy Act, 12 U.S.C. § 3401 *et seq.* There is no such specific authorization for the Bureau's data demands, and even if there were, the Right to Financial Privacy Act limits the Bureau's use of such information to its examination authority, *see* 12 U.S.C. § 3413(r), and your testimony makes clear that the Bureau plans to use this information for other purposes.

[6] GAO, *Management Report: Opportunities for Improvement in the Bureau of Consumer Financial Protection's Internal Controls and Accounting Procedures* (May 21, 2012), *available at* http://gao.gov/assets/600/590993.pdf.

The Honorable Richard Cordray
June 19, 2013
Page 8

Companies that have been entrusted with their customers' confidential data take very seriously their obligation to protect that data against unauthorized release. Moreover, the brand damage and potential liability associated with such releases can be substantial. Companies often are sued by consumers claiming injury from the disclosure of confidential information—and consumers could argue in such litigation that a company violated the law by delivering data to the Bureau that the Bureau had no legal right to obtain.

The Bureau should not require companies to provide this sensitive data until it demonstrates that it has the legal authority to do so and, in addition, has the necessary security regime in place and obtained confirmation from the GAO that the Bureau's procedures are equivalent to those employed by the federal bank regulatory agencies and other similar government agencies.

Moreover, the governing statute permits the Bureau to impose information-reporting requirements that are "***necessary*** for the Bureau to fulfill the monitoring, assessment, and reporting responsibilities imposed by Congress." Section 1022(c)(4)(B),12 U.S.C. § 5512(c)(4)(B) (emphasis added). Other agencies do not demand comprehensive data; they use a sampling approach. The Bureau has never explained why it cannot rely on the random-sampling approach utilized by a wide variety of federal agencies, from the SEC to NHTSA, to USDA.

Thank you for your consideration of these concerns. We would be happy to discuss them further with you or your staff.

Sincerely,

David Hirschmann